RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

NAYA L. ABBEY; D.H., a minor, by and through his parents and next of kin Justin Hernandez and Naya L. Abbey,

　　　　　*Plaintiffs-Appellants*,

　　*v.*

METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE; TERRANCE STUCKEY,

　　　　　*Defendants-Appellees*.

No. 25-5736

―――――――――――

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:23-cv-00300—Waverly D. Crenshaw, Jr., District Judge.

Decided and Filed:  July 17, 2026

Before:  COLE, CLAY, and MURPHY, Circuit Judges.

―――――――――――

## COUNSEL

**ON BRIEF:**  Lucas E.W. Jerkins, JERKINS LAW, PLLC, Spring Hill, Tennessee, for Appellants.  Melissa Roberge, Michael Dohn, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellees.

　　　MURPHY, J., announced the judgment of the court in which COLE, J., concurred in part. MURPHY, J., also delivered the lead opinion, in which COLE, J., concurred in part.  COLE, J. (pp. 14–16), delivered a separate concurring opinion.  CLAY, J. (pp. 17–33), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

MURPHY, Circuit Judge.  Officer Terrance Stuckey arrested Naya Abbey during a traffic stop.  Stuckey testified at Abbey's preliminary hearing that she refused to stop when he tried to pull her over.  Abbey disagreed with these charges.  But she could not tell her side of the story at trial because a state court indefinitely stayed her criminal case.  Three years later, prosecutors disclosed dispatch tapes of Stuckey's interactions with a dispatcher while he followed Abbey.  Because these tapes allegedly supported Abbey's version of events, the prosecutors dismissed the charges against her.  Abbey and her son, D.H., then brought this suit against Stuckey and the Metropolitan Government of Nashville and Davidson County ("Metro") under 42 U.S.C. § 1983.  They alleged that Stuckey violated the Fourth Amendment during the traffic stop.  And Abbey alleged that Metro violated its duty to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding the dispatch tapes for three years.  The district court dismissed their complaint.

This appeal raises a procedural question about § 1983's statute of limitations and a substantive question about *Brady*'s scope.  The procedural question asks: Did the applicable one-year statute of limitations start to run on the (earlier) date of the traffic stop or the (later) date of the disclosure of the dispatch tapes?  In my view, even under the "discovery" rule of accrual, the statute of limitations began at the time of the traffic stop because Abbey knew of her injury and its source by then.  She thus did not timely pursue her Fourth Amendment claims.  The substantive question asks: Did Metro's three-year delay in disclosing the dispatch tapes violate *Brady*?  Like other circuit courts, I would answer "no" because *Brady* creates a trial right and prosecutors dismissed Abbey's charges before trial.  All this said, the district court did err by dismissing D.H.'s Fourth Amendment claims against Stuckey on its own initiative without notice.  All told, I would affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

I

This case reaches us at the pleading stage. At that stage, we must accept the operative complaint's well-pleaded factual allegations as true—whether or not the discovery process would confirm or refute those allegations later in the litigation. *See Rudd v. City of Norton Shores*, 977 F.3d 503, 507, 511 (6th Cir. 2020). So I will describe the facts using those allegations alone.

Abbey lived with her "autistic and nonverbal" minor son, D.H., in Nashville, Tennessee. Am. Compl., R.42, PageID 260–61. The lease expired on their Nashville home in the summer of 2019. But the lease on her new home did not begin until later. During this gap, Abbey decided to live at a friend's home and store her belongings there.

On August 14, 2019, Abbey repeatedly drove to her friend's home moving boxes of her possessions. That evening, she noticed a "blue car" following her on one of these trips. *Id.*, PageID 262. When she made it to the friend's home, she and her son refused to exit her vehicle because this unknown car had parked right behind her. She drove off out of fear for her safety. Yet the blue car started to follow her again. Although Abbey "was following all traffic laws," the car turned on its sirens and flashing lights after she passed through an intersection. *Id.* Around 8:13 p.m., she stopped and turned on her hazard lights. Apart from this car, "aviation services" were also monitoring her from above. *Id.*, PageID 263.

Officer Stuckey and another officer got out of the blue car. They drew their firearms and yelled at Abbey to exit her vehicle. Ultimately, they "forcibly removed" her "at gunpoint," put her in handcuffs, and placed her in the back of their vehicle. *Id.* Stuckey told Abbey that she had "committed the offenses of felony reckless endangerment and evading arrest" by refusing to stop when he had turned on his flashing lights. *Id.* He also alleged that she had almost hit a pedestrian. Stuckey claimed that he first activated his vehicle's flashing lights at 8:02 p.m., which would have meant that Abbey failed to stop for over ten minutes. After arresting Abbey, Stuckey searched her car, told her that they would place D.H. in the custody of Children's Protective Services, and transported her to jail. The jail released Abbey after she spent several hours in custody.

Prosecutors charged Abbey with various crimes. Stuckey testified at her preliminary hearing. He claimed that Abbey had sped through multiple intersections and refused to stop after he had "engaged his sirens and lights." *Id.*, PageID 265. A state judge bound her case over "from general sessions court to Criminal Court[.]" *Id.*, PageID 266. For unidentified reasons, though, Abbey's case remained stayed in that court for three years.

On August 24, 2022, over three years after the incident, Abbey finally obtained the dispatch tapes that recorded Stuckey's statements to dispatch as he followed her vehicle back in August 2019. Abbey alleges that these tapes contradicted Stuckey's testimony at her preliminary hearing. According to the complaint, Stuckey told dispatch that Abbey "was driving normal speeds" and that he was "not in pursuit" of her. *Id.*, PageID 263, 266. He also did not claim to dispatch that she had "fled at multiple intersections" as he had alleged at the hearing. *Id.*, PageID 266. The "time stamps" on the tapes also conflicted with Stuckey's preliminary-hearing testimony. *Id.*

These inconsistencies allegedly led state prosecutors to conclude that Stuckey had never activated his lights except right before he stopped Abbey at 8:13 p.m. Prosecutors thus dismissed the criminal case against Abbey a week after the disclosure of the dispatch tapes.

But the case had already harmed Abbey and D.H. Abbey had been pregnant with her second child at the time of the traffic stop. But the stress of the case caused a miscarriage. Abbey also lost her job and could not find other employment because background checks kept flagging her pending felony charges. And she lost the lease on her new home when the landlord learned of those charges. So she remained homeless for about two years. While living on the streets, Abbey lacked enough food to eat, and unknown criminals physically and sexually assaulted her. She became pregnant with her third child while homeless. But she lacked access to medical care and did not realize that she had gestational diabetes. As a result, her third child tragically died just two days after birth. Lastly, Abbey has had no "meaningful contact" with D.H. in years. *Id.*, PageID 269. He has lived with his father in Alabama since her preliminary hearing. The traffic stop has also caused D.H. to suffer from ongoing "fear and anxiety, night terrors, and trepidation around authority figures." *Id.*, PageID 271.

In April 2023, Abbey and D.H. sued Officer Stuckey and Metro under 42 U.S.C. § 1983. Although Abbey and her son originally proceeded without a lawyer, they had retained counsel by the time that they filed their operative complaint. That complaint alleged three claims against Stuckey under the Fourth Amendment. It first alleged that he committed an unreasonable seizure by stopping Abbey's vehicle, arresting her without probable cause, and seizing and detaining D.H. It next alleged that he committed an unreasonable search by looking through Abbey's car without probable cause to believe that it contained contraband. It then alleged that Stuckey used excessive force on Abbey by forcibly pulling her from the car, throwing her to the ground, and handcuffing her. Apart from these claims against Stuckey, the operative complaint also sought to hold Metro liable for the Fourth Amendment violations and a *Brady* violation based on the lengthy concealment of the dispatch tapes.

Stuckey and Metro each moved to dismiss the complaint. Metro sought to dismiss Abbey *and* D.H.'s claims, but Stuckey moved to dismiss *only* Abbey's claims and not D.H.'s. Yet the district court dismissed *all* claims, even D.H.'s claims against Stuckey. *See Abbey v. Metro. Gov't of Nashville & Davidson Cnty.*, 2025 WL 1901344, at *7 (M.D. Tenn. July 9, 2025). The court held that Tennessee's statute of limitations barred Abbey's Fourth Amendment claims against Stuckey. *See id.* at *4. It found that these claims accrued when Stuckey arrested Abbey and searched her car in 2019. *See id.* at *3. But Abbey did not file this suit until 2023—over three years after the one-year statute of limitations had run. *See id.* at *4. It next held that Metro's eventual disclosure of the dispatch tapes foreclosed Abbey's *Brady* claim. *Id.* at *5. And regardless, it found that Abbey's and D.H.'s claims against Metro failed to allege that a municipal policy or custom had caused any purported constitutional violation. *Id.* at *5–7.

II

Abbey and D.H. raise three arguments on appeal. First, Abbey argues that the district court mistakenly held that she did not timely file her Fourth Amendment claims against Stuckey. Second, Abbey argues that the district court wrongly dismissed her *Brady* claim against Metro. Third, D.H. argues that the district court improperly dismissed his claims against Stuckey on its

own initiative. Reviewing the district court's decision de novo, I disagree with Abbey but agree with D.H. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1007 (6th Cir. 2022).

### A. Abbey's Fourth Amendment Claims Against Officer Stuckey

Abbey first challenges the statute-of-limitations dismissal of her three Fourth Amendment claims against Officer Stuckey under 42 U.S.C. § 1983. Section 1983 lacks its own statute of limitations and instead incorporates the most analogous state-law limitations period. *See Reguli v. Russ*, 109 F.4th 874, 879 (6th Cir. 2024) (per curiam). The parties agree that Abbey's Fourth Amendment claims trigger a one-year statute of limitations under Tennessee law. *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1161 (6th Cir. 2021). But they disagree on the "accrual date" for the claims—that is, the date on which the one-year clock started to run on them. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). This accrual question turns on federal (not state) law. *See id.*

Before we can identify the specific accrual date for the claims, we must identify the accrual rule that governs them. Under the so-called "occurrence" rule, the Supreme Court has held that a statute of limitations "presumptively" starts on the first day that "a complete and present cause of action" exists. *McDonough v. Smith*, 588 U.S. 109, 115 (2019) (quoting *Wallace*, 549 U.S. at 388); *see Reguli*, 109 F.4th at 879. In other words, this rule triggers the limitations period when a claim's elements have all arisen, *see Reguli*, 109 F.4th at 879, such that the plaintiff can sue in court on the claim, *see Wallace*, 549 U.S. at 388. Our cases, by contrast, have departed from this presumptive occurrence rule in § 1983 suits by regularly following a "discovery" rule instead. *See Reguli*, 109 F.4th at 879–80. This rule starts the limitations period on the date that the plaintiff learned of (or should have learned of) certain "facts about the claim." *Id.*

The parties dispute whether the standard "occurrence" rule or the competing "discovery" rule should apply to Abbey's three Fourth Amendment claims under § 1983. Because the complaint "alleges facts showing" that Abbey did not timely file her three claims under either accrual rule, we need not choose between them to resolve this case. *Id.* at 879.

To start, Abbey seemingly concedes that she did not timely file her three Fourth Amendment claims if the occurrence rule applies. She alleges that Stuckey committed an unreasonable seizure when stopping her car and arresting her; that he committed an unreasonable search when searching her car; and that he used excessive force when restraining her. Although the parties do not identify the elements for these claims, Abbey does not dispute that the claims all arose (and that she "could have filed suit" to litigate them) on the day of the traffic stop: August 14, 2019. *Wallace*, 549 U.S. at 388. True, an unreasonable-seizure claim that challenges an arrest might trigger a special rule that delays the claim's accrual until the defendant releases the plaintiff from custody or provides "legal process" to justify the detention. *Dibrell*, 984 F.3d at 1162. But the complaint alleged that the jail released Abbey within hours of her arrest. So this "refinement" on the standard occurrence rule does not matter here. *Wallace*, 549 U.S. at 388. And because Abbey did not sue until April 2023, her claims would fall well outside the one-year statute of limitations under the occurrence rule's accrual date.

Abbey thus relies on the discovery rule to save her claims. This rule triggers the statute of limitations on the date that the plaintiff first knew of (or should have known of) certain facts about the claim. *See Reguli*, 109 F.4th at 879–80. But which facts matter? Our cases leave the answer unclear. *See id.* at 882–83. At times, we have found that a claim accrues when the plaintiff learns of the injury *alone*. *See Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). In another case, though, we have said that a claim does not accrue until a plaintiff learns of "both his injury and the *cause* of that injury." *Bishop v. Child.'s Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010) (citation omitted) (emphasis added).

Neither version of the discovery rule helps Abbey. Even if she had to learn of both her injuries and their cause, she discovered these facts on the day of the traffic stop in August 2019. Her complaint leaves no doubt that she knew of her *injuries* on this date. As for the arrest, the complaint alleges that "Abbey was aware of her confinement" when Stuckey restrained her and "took [her] to jail" for an hours-long detention. Am. Compl., R.42, PageID 264, 270; *see Fox v. DeSoto*, 489 F.3d 227, 233 (6th Cir. 2007), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). As for the search, the complaint alleges that Stuckey "searched Abbey's vehicle" in her presence, so she would have likewise learned of the search at that time. Am.

Compl., R.42, PageID 264; *see Wynn v. City of Covington*, 2025 WL 2093032, at *2 (6th Cir. July 25, 2025). As for the force, she knew that she had been "thrown to the ground, held to the ground, and placed in handcuffs" as these events were happening. Am. Compl., R.42, PageID 270; *see Miller v. Cocke County*, 2022 WL 103143, at *2 (6th Cir. Jan. 11, 2022). Her complaint also leaves no doubt that she learned the *cause* of the arrest, search, and force (a Nashville police officer) on the same day. Am. Compl., R.42, PageID 263–64. And even if Abbey needed to know Stuckey's identity, the complaint leaves no doubt that she had learned this fact when he testified at her preliminary hearing in August 2019. *Id.*, PageID 265; *but cf. Wynn*, 2025 WL 2093032, at *3. In sum, Abbey's knowledge of both the injury and its cause started the limitations period in August 2019. Even if we follow the discovery rule, then, she still did not sue on time.

Abbey responds with a single point. She argues that the discovery rule should delay the start of the statute of limitations until August 2022 when she received the "dispatch tapes" that "completely discounted" Stuckey's preliminary-hearing testimony. Appellants' Br. 15–16. She reasons that her unreasonable-search and unreasonable-seizure claims required proof that Stuckey lacked probable cause. Until the disclosure of the tapes, though, she says that she had "no basis" to show the absence of probable cause "other than her belief in her innocence[.]" *Id.* at 15. She adds that even her excessive-force claim lacked evidentiary support until she received the tapes because Stuckey's testimony about her conduct "would justify a greater use of force" than what the tapes revealed. *Id.* at 16. In essence, Abbey argues that the discovery rule delays the accrual date until she knew (or should have known) of the *unlawful nature* of the seizure, search, and force.

This broad expansion of the discovery rule has both legal and factual problems. Legally, "a claim accrues" under the discovery rule "upon awareness of *actual injury*, not upon awareness that the injury constitutes a *legal wrong*." *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1125 (3d Cir. 1997). Take the medical-malpractice context. There, the Supreme Court has held that the discovery rule requires plaintiffs to know (at most) that a medical provider's conduct caused a patient's health problem—not that the provider's conduct qualified as (wrongful) malpractice. *See United States v. Kubrick*, 444 U.S. 111, 118–25 (1979). Or take

the employment context. There, the circuit courts have held that the discovery rule requires plaintiffs to know that an employer took an adverse "employment action" against them—not that the employer harbored a (wrongful) discriminatory purpose when taking the action. *Reguli*, 109 F.4th at 884 (collecting cases); *see, e.g.*, *Amini v. Oberlin Coll.*, 259 F.3d 493, 499–500 (6th Cir. 2001).

It would make no sense to adopt a more lenient discovery rule for Fourth Amendment claims like Abbey's. After all, those types of claims depend on the *objective* reasonableness of the officer's actions. *See Torres v. Madrid*, 592 U.S. 306, 317 (2021); *Graham v. Connor*, 490 U.S. 386, 397–99 (1989). So unlike employment claims (which depend on an employer's hidden *subjective* mindset), Fourth Amendment claims do not turn on facts peculiarly in the defendant's control. *Cf. Amini*, 259 F.3d at 499–501. And unlike medical-malpractice claims (which require technical medical expertise that most plaintiffs lack), Fourth Amendment claims often require an inquiry into the "considerations of everyday life" on which "reasonable" people (not "legal technicians") rely. *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citation omitted). As a result, Fourth Amendment plaintiffs have a much greater ability "to protect [their] rights" once they learn of their injury than do malpractice or employment plaintiffs. *Miller*, 2022 WL 103143, at *2.

Unsurprisingly, then, our Fourth Amendment cases do not support Abbey's proposed rule. To the contrary, we have often held that these claims accrue once a plaintiff knows of an "*actual injury*" (an arrest, a search, or a use of force), not when the plaintiff knows of the "*legal wrong*" underlying the injury (that the arrest or search lacked probable cause or the use of force was excessive). *New Castle County*, 111 F.3d at 1125. Many cases have thus concluded that an unreasonable-seizure claim or an unreasonable-search claim accrued on the date of the arrest or search. *Wynn*, 2025 WL 2093032, at *2; *Codrington v. Dolak*, 142 F.4th 884, 890–91 (6th Cir. 2025); *Ruffin v. Kudley*, 2020 WL 7062665, at *2 (6th Cir. Sept. 1, 2020) (order). And many cases have concluded that an excessive-force claim accrued on "the date the allegedly excessive force [was] used." *Hodge v. City of Elyria*, 126 F. App'x 222, 224 (6th Cir. 2005); *see Dibrell v. Rex*, 2025 WL 3285587, at *3 (6th Cir. Nov. 25, 2025); *Wynn*, 2025 WL 2093032, at *2; *Miller*, 2022 WL 103143, at *2; *Fox*, 489 F.3d at 233. Under these cases, Abbey's claims accrued on

the date of the arrest, search, and use of force—not on the date that she received the dispatch tapes allegedly contradicting Stuckey's testimony.

Factually, even if Abbey were correct that the statute of limitations accrued only when she knew or should have known of the "*legal wrong*," *New Castle County*, 111 F.3d at 1125, she had a basis to know of that wrong before she received the dispatch tapes. The complaint alleged that Abbey "was following all traffic laws" on the date of Stuckey's traffic stop. Am. Compl., R.42, PageID 262. It also alleged that she spotted a "blue car" following her that did not have any sirens or flashing lights activated. *Id.* And when this car later turned on its siren and lights, the complaint alleged that Abbey "immediately" pulled over her vehicle. *Id.*, PageID 263. So her own personal knowledge of the events "should have" led her to believe that Stuckey acted improperly. *Wynn*, 2025 WL 2093032, at *2. Although the dispatch tapes provided additional evidence to support Abbey's version of the events, she could have relied on her own testimony to pursue this case. And the discovery rule does not delay the statute of limitations until the date that a plaintiff gathers enough evidence *to win the case*; it delays the statute of limitations until the date that "the average lay person" should have recognized the need to *investigate further*. *Miller*, 2022 WL 103143, at *2. Under the complaint's own allegations, Abbey should have recognized the need for this investigation on the date of the traffic stop. She thus did not file timely claims against Stuckey. And Abbey raised no equitable-tolling or fraudulent-concealment claims, so we need not consider these distinct (and unbriefed) grounds for delaying the expiration of the statute of limitations. *See Reguli*, 109 F.4th at 884; *see also United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020).

## B. *Brady* Claims Against Metro

Abbey next challenges the dismissal of her claim that Metro violated her *Brady* rights by concealing the dispatch tapes for three years. The Fourteenth Amendment's Due Process Clause makes clear that Tennessee may not "deprive" Abbey of her "liberty" without providing her "due process of law[.]" U.S. Const. amend. XIV, § 1. In *Brady*, the Supreme Court read this text to require state prosecutors to turn over "evidence favorable to an accused" if the evidence "is material" to the accused's guilt or punishment. 373 U.S. at 87. Since then, the Court has

distilled *Brady* into "three well-known elements." *Clark v. Louisville-Jefferson Cnty. Metro Gov't*, 130 F.4th 571, 578 (6th Cir. 2025) (per curiam). The government must have suppressed evidence. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999). The suppressed evidence must favor the defendant. *See id.* And this evidence must matter (that is, be "material") to the defense. *See id.*

Abbey's *Brady* claim fails on materiality grounds. The Supreme Court has treated evidence as "material" only if "a reasonable probability" exists that the evidence would have led to a "different" "result" in the "proceeding[.]" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). And by the "proceeding," the Court means the criminal *trial*. It has indicated, for example, that evidence meets this materiality test when it "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). And it has said that the prosecution violates the *Brady* rule only when the suppression of evidence "deprives the defendant of a fair trial." *Bagley*, 473 U.S. at 678. So the Court described *Brady* as creating a "trial-related" disclosure right. *United States v. Ruiz*, 536 U.S. 622, 631 (2002).

As a result, we and other circuit courts have held that no *Brady* violation occurs from the suppression of evidence if the prosecution dismisses the criminal case before a defendant stands trial. *See Lech v. Gettel*, 2024 WL 2815971, at *1–2 (6th Cir. June 3, 2024); *Snow v. Nelson*, 634 F. App'x 151, 155 (6th Cir. 2015); *see also Anderson v. Baltimore County*, 2025 WL 3459768, at *5 (4th Cir. Dec. 2, 2025) (per curiam); *Phillips v. Whittington*, 2022 WL 797418, at *8 (5th Cir. March 15, 2022) (per curiam); *Gill v. City of Milwaukee*, 850 F.3d 335, 343 (7th Cir. 2017); *Livers v. Schenck*, 700 F.3d 340, 359 (8th Cir. 2012); *Parker v. County of Riverside*, 78 F.4th 1109, 1113–14 (9th Cir. 2023) (per curiam); *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998) (per curiam). These courts "universally" reason that a *pretrial* dismissal of charges cannot infringe "the right to a fair trial" that *Brady* protects even if prosecutors did not disclose evidence before the dismissal. *Morgan*, 166 F.3d at 1310.

This law poses an insurmountable obstacle for Abbey's *Brady* claim because her complaint alleges that she "never stood trial." *Snow*, 634 F. App'x at 155. Rather, prosecutors "dismissed the criminal actions against" her a week after they revealed the dispatch tapes. Am. Compl., R.42, PageID 266. There can be no doubt that (under the complaint's well-pleaded allegations) the felony charges created many serious hardships for Abbey. But the injuries that she identifies are not the type of harms that "*Brady* claims are intended to remedy." *Snow*, 634 F. App'x at 156. Because Abbey has not asserted that the suppression of evidence caused her to receive an "unfair trial," she has not alleged a viable *Brady* violation. *Brady*, 373 U.S. at 87.

In response, Abbey points out that prosecutors took three years to disclose the dispatch tapes and that a delayed disclosure can sometimes violate *Brady*. *See United States v. Spry*, 238 F. App'x 142, 147–48 (6th Cir. 2007). But this delay implicates *Brady* only if a defendant shows that the delay so undermined the defense's trial strategy that "a reasonable probability" of an acquittal would have existed if the prosecution had revealed the evidence in a timely manner. *Id.* at 148. This rule does not help Abbey. Because prosecutors dismissed her criminal charges, the delay could not have affected her trial strategy. *Brady* thus does not reach her allegations.

## C. D.H.'s Fourth Amendment Claim Against Officer Stuckey

D.H. separately challenges the district court's decision to reject his Fourth Amendment claim against Officer Stuckey without giving him any notice. All agree that, while Metro moved to dismiss all claims against it, Stuckey moved to dismiss only Abbey's claims. The district court thus dismissed D.H.'s claims against Stuckey on its own initiative. We review a district court's decision to dismiss a complaint sua sponte for abuse of discretion, but we also review any underlying legal conclusions de novo. *See Doe v. Oberlin Coll.*, 60 F.4th 345, 351 (6th Cir. 2023).

The district court abused its discretion here. Before dismissing a complaint, the court should have "notif[ied] all parties of its intent to dismiss" and given D.H. "a chance to either amend his complaint or respond to the reasons stated by the district court" for the dismissal. *Id.* (quoting *Tingler v. Marshall*, 716 F.2d 1109, 1112 (6th Cir. 1983)). Yet the court took neither action. Rather, it dismissed D.H.'s claims against Officer Stuckey without notice or an

opportunity to brief the dismissal. In fairness to the court, the decision by plaintiffs' counsel to file a single response to both Metro's and Stuckey's motions blurred the status of Abbey's and D.H.'s distinct claims. Even so, without notice, D.H. had no opportunity to respond to Stuckey's arguments.

We have suggested that this type of error can be harmless if, for example, the court bases the dismissal on a legal issue that is not open to doubt. *See id.* at 353. To his credit, however, Officer Stuckey does not defend the district court's judgment on this ground. Rather, he concedes that D.H.'s claims are likely timely because Tennessee law tolls the statute of limitations for minors until they turn 18. *See* Tenn. Code Ann. § 28-1-106(a); *see also Wallace*, 549 U.S. at 394–95. So we cannot uphold the district court's decision on harmlessness grounds.

Officer Stuckey instead suggests that D.H. forfeited any reliance on Tennessee's tolling statute by failing to cite it in his opening brief on appeal. Yet D.H. established the district court's error in that brief, thereby shifting the burden to Stuckey to establish the error's harmlessness. He failed to meet this burden. We thus must vacate the dismissal of D.H.'s Fourth Amendment claim against Officer Stuckey. *Cf. Shelton v. United States*, 800 F.3d 292, 295 (6th Cir. 2015).

The district court's judgment is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

---

**CONCURRENCE**

---

COLE, Circuit Judge, concurring in part and concurring in the judgment. I agree with the lead opinion's reasoning and conclusion in Part II.C. I also agree with the conclusions of Parts II.A and II.B: Naya Abbey filed her complaint outside Tennessee's applicable statute of limitations and failed to state a *Brady* claim against Metro. I write separately, however, because I share the dissenting opinion's concerns regarding the lead opinion's application of the discovery rule and the problematic behavior of law enforcement officers in this case. I also depart from the lead opinion on its discussion of the scope of *Brady v. Maryland*, 373 U.S. 83 (1963).

I.

Regarding Part II.A., I concur only in the judgment. This court has "long held that the discovery rule applies in the § 1983 context[,]" and like the dissent, I find no basis for departing from our binding precedent. *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022). Applying the discovery rule, I agree that Abbey's claims accrued on the date of her arrest, but I am unpersuaded by the lead opinion's characterization of Fourth Amendment claims.

The lead opinion reasons that Fourth Amendment claims are based on the "considerations of everyday life," and plaintiffs, therefore, "have a much greater ability" to vindicate their rights upon learning of their injury. Lead Op. 9 (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). I strongly disagree. Many Fourth Amendment plaintiffs, like Abbey, face criminal charges and unjust prosecution. *See e.g.*, *Fox v. DeSoto*, 489 F.3d 227, 231–32 (6th Cir. 2007), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). These barriers hinder a plaintiff's understanding of the factual basis giving rise to her constitutional injury, and like employment discrimination cases, these facts may be "peculiarly in the defendant's control." Lead Op. 9. A driver, for example, is likely unaware of every traffic law and regulation, so she may not know whether probable cause existed for a stop or search.

Further, the lead opinion places too much weight on objective reasonableness and fails to consider that an injury from an unreasonable search or seizure may be less apparent than an injury in a medical malpractice or employment discrimination suit. Although litigating those claims requires technical expertise and ample discovery, the actual injury of a botched procedure or lost job is sometimes more obvious than an injury from an unreasonable traffic stop.

Unfortunately, these considerations do not alter the outcome in this case. According to Abbey's amended complaint, she "was following all traffic laws" prior to being stopped. (Am. Compl., R. 42, PageID 262.) She therefore "discovered, or reasonably should have discovered" "both h[er] injury and the cause of that injury" at the time of her arrest. *See Reguli v. Russ*, 109 F.4th 874, 879, 882 (6th Cir. 2024) (citation modified).

I nevertheless remain deeply troubled by Abbey's allegations. Abbey alleges that Officer Terrance D. Stuckey falsely attested that Abbey had committed felony offenses, that prosecutors withheld dispatch recordings contradicting that account for nearly three years, and that the charges were dismissed only after those recordings were finally disclosed. These allegations suggest that Abbey could have brought a malicious prosecution claim. *See Sykes v. Anderson*, 625 F.3d 294, 308–10 (6th Cir. 2010).

The tragic facts alleged here may also have supported an equitable tolling argument. "Strictly defined, equitable tolling is the doctrine that the statute of limitations will not bar a claim if the plaintiff, despite diligent efforts, did not discover the injury until after the limitations period had expired." *Mezo v. Holder*, 615 F.3d 616, 620 (6th Cir. 2010) (citation modified). Although equitable tolling "is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs," Abbey alleges extraordinary hardships caused by her arrest, including criminal prosecution, homelessness, loss of employment, separation from her child, a miscarriage, and the death of a newborn. *See Wallace v. Kato*, 549 U.S. 384, 396 (2007). Rather than briefly mentioning the "notions of equity," counsel could have developed an equitable tolling argument based on those circumstances. (Appellant Br. 14.) Although this issue is not before us, I encourage future litigants confronting similarly difficult circumstances to argue for equitable tolling.

## II.

Because the lead opinion understates the scope of *Brady*, I likewise concur only in the judgment of the lead opinion's analysis of Abbey's *Brady* claims against Metro in Part II.B.  To prove a *Brady* violation, the state must have failed to disclose evidence, the undisclosed evidence must favor the defendant by showing innocence or impeaching an unfavorable witness, and the nondisclosure must prejudice the defendant.  *Clark v. Louisville-Jefferson Cnty. Metro Gov't*, 130 F.4th 571, 578 (6th Cir. 2025) (per curiam).  Such "prejudice" occurs when the undisclosed evidence is "'material'—meaning that there is a 'reasonable probability' that the trial outcome would have changed if the prosecution had turned over the evidence."  *Id.* (quoting *Turner v. United States*, 582 U.S. 313, 324 (2017)).  The lead opinion is therefore correct that *Brady* generally protects "trial-related" rights.  Lead Op. 11 (quoting *United States v. Ruiz*, 536 U.S. 622, 631 (2002)).

But *Brady*'s disclosure obligations may extend beyond trial in certain circumstances.  For example, this court has not resolved whether the government must disclose material exculpatory evidence before a defendant enters a guilty plea, and the circuits are divided on that question.  *See Robertson v. Lucas*, 753 F.3d 606, 621–22 (6th Cir. 2014); *Miller v. Gettel*, Nos. 22-1034/1046, 2023 WL 2945340, at *7 (6th Cir. Apr. 14, 2023).  I therefore do not agree that Abbey's failure to stand trial "poses an insurmountable obstacle" for her *Brady* claim.  Lead Op. 12.  Rather, her *Brady* claim fails because the prosecution ultimately dismissed the charges against her.  *See Snow v. Nelson*, 634 F. App'x 151, 155–56 (6th Cir. 2015).  On that basis, I concur in the judgment.

## III.

Today's decision should not be understood as approving of the conduct alleged in Abbey's complaint.  If her allegations are true, Officer Stuckey and the prosecutors committed serious official misconduct that inflicted profound and lasting harm.  The expiration of the statute of limitations does not render that conduct lawful, acceptable, or excusable.  It simply deprives this court of authority to provide relief.  Because the governing law leaves no alternative, I concur in the judgment as to Parts II.A. and II.B.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. Contrary to my colleagues' opinions, Naya Abbey did not surrender her Fourth Amendment claims against Officer Terrance Stuckey based on statute of limitations grounds. Two separate reasons support that conclusion. First, law enforcement's inexcusable years-long withholding of exculpatory evidence delayed the filing of this lawsuit. Law enforcement's actions impeded Abbey's knowledge of Stuckey's Fourth Amendment violations and should toll the statute of limitations. Second, under this Court's discovery rule, the limitations period for Abbey's Fourth Amendment claims did not begin to run until Abbey had notice that Stuckey lacked probable cause to search and seize her. The face of Abbey's complaint sets forth the plausible contention that Abbey did not have reason to know of her cause of action until the government released the dispatch tapes from the day of her arrest. Penalizing Abbey by discrediting her account of what facts she reasonably should have known from her encounter with Stuckey is unjust, to say the least. I would reverse the district court's dismissal of Abbey's claims against Stuckey.

According to the facts alleged in Abbey's complaint, which we accept as true at the pleading stage, *Romero v. City of Lansing*, 159 F.4th 1002, 1006 (6th Cir. 2025), on August 14, 2019, Stuckey and another officer tailed Abbey's car, eventually activating their siren and lights to initiate a traffic stop. When Abbey complied and pulled over, the officers emerged with firearms drawn, yelled at Abbey, removed her from her car, searched it, held Abbey to the ground, handcuffed her, and placed her in their car. They told Abbey that she had committed the felonies of driving recklessly and evading arrest. Stuckey's story, from the day of the arrest through a preliminary hearing in Abbey's criminal case, was "that Abbey did not stop for the [police vehicle's] blue lights and siren, but instead sped through [two] intersection[s,]" until finally stopping at a third light, "where Stuckey, for a third time, engaged his sirens and lights." Am. Compl., R. 42, PageID #265.

Three years later, much of the damage of Abbey's ongoing criminal prosecution had already been done. As a direct result of the charges against her, Abbey lost her job and her home and could not secure new employment or a new lease. Unhoused, she suffered malnourishment, physical and sexual assault, battery, and exposure to the elements. Abbey's stress and circumstances took a toll on her physical health and cost her the loss of a pregnancy and then the death of a newborn. She lost all "meaningful contact" with her living son, D.H., who is non-verbal and autistic and began residing with his father in another state after Abbey's arrest. *Id.* at PageID #269.

Throughout those three years, while Abbey's criminal charges wreaked havoc on her life, the government held onto dispatch tapes, which Abbey claims are exculpatory, from the date of date of Abbey's arrest. On August 24, 2022, the government finally produced the tapes of Stuckey's calls with dispatch from August 14, 2019. According to Abbey, those tapes revealed that Stuckey did not have a basis to stop her, contrary to his contemporaneous assertions. Stuckey had claimed that he arrested Abbey for driving dangerously and evading arrest and testified that she had been speeding through intersections while his sirens and lights operated. But on the recordings, Stuckey "advised [dispatch] that Abbey was driving normal speeds and [that he] was not in pursuit . . . ." *Id.* at PageID #266. He "did not advise that Abbey had fled at multiple intersections, and the time stamps were inconsistent with Stuckey's testimony." *Id.* The prosecution dismissed the charges against Abbey one week after disclosing the dispatch recordings.

In the case on appeal, Abbey claims that Stuckey violated her Fourth Amendment rights by seizing her, searching her car, and using excessive force against her. The district court dismissed Abbey's Fourth Amendment claims as untimely. *Abbey v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:23-CV-00300, 2025 WL 1901344, at *4 (M.D. Tenn. July 9, 2025). Abbey asserts that her claims did not accrue until law enforcement disclosed the dispatch tapes. Defendants contend that the Fourth Amendment claims were time-barred because Plaintiffs filed the complaint more than one year after the date of Abbey's arrest.

We review *de novo* the district court's dismissal on timeliness grounds. *J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 292 (6th Cir. 2019). To survive a motion to dismiss, a plaintiff must plead sufficient facts that the claim is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility means that the court may reasonably infer from the facts alleged that the defendant is liable. *Chrestman ex rel. Wooden v. Metropolitan Gov't & Davidson Cnty.*, 156 F.4th 694, 700 (6th Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678). "[W]e credit all well-pleaded factual allegations in [the] complaint and draw all reasonable inferences in [Abbey's] favor." *Romero*, 159 F.4th at 1006.

The prosecution's alleged conduct in Abbey's criminal case weighs in favor of allowing Abbey's civil rights claims to proceed. Evidently, law enforcement possessed dispatch recordings, which the government had reason to know contradicted Stuckey's central testimony about his perceptions of Abbey on the day of her arrest. Viewing the prosecution's actions in a generous light, the prosecution failed to diligently review and disclose the presumably small amount of evidence relevant to Abbey's charges. Viewed more candidly, the prosecution committed misconduct by deliberately sitting on exculpatory evidence for three years without explanation. *Cf. Allah-U-Akbar v. Bradshaw*, 154 F.4th 482, 495 (6th Cir. 2025 ("[S]ubstantial inequitable conduct . . . includes 'wrongfully retaining and delaying the production of . . . exculpatory evidence[.]'" (third and fourth alterations in original) (quoting *Mason v. Mitchell*, 729 F.3d 545, 552 (6th Cir. 2013))), *cert. denied sub nom. Allah-U-Akbar v. May*, No. 25-6909, 2026 WL 1513290 (U.S. June 1, 2026). Neither of my colleagues offers an explanation for those actions. Fairness counsels adjudicating Abbey's delayed claims, given the prosecution's role in delaying them. *Cf. Agristor Leasing v. Saylor*, 803 F.2d 1401, 1405 (6th Cir. 1986) ("Fraudulent concealment of a cause of action tolls the statute of limitations." (citation omitted)); *Smith v. Hilliard*, 578 F. App'x 556, 566 (6th Cir. 2014) ("Tennessee courts have long held that 'fraudulent concealment will toll the running of a statute of limitations[, and] . . . the doctrine of fraudulent concealment is aligned with the discovery rule.'" (citation omitted)); *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 474 (6th Cir. 2013) (describing in the context of Ohio law that "[u]nder the fraudulent concealment doctrine, a statute of limitations may be tolled

'where there is some conduct of the adverse party . . . which excludes suspicion and prevents inquiry.'" (citation omitted)); *Lashlee v. Sumner*, 570 F.2d 107, 110 (6th Cir. 1978) ("Deliberate concealment by a defendant of the plaintiff's cause of action will toll the statute of limitations.").

Equitable tolling "allows courts to toll a statute of limitations when 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Robertson v. Simpson*, 624 F.3d 781 (6th Cir. 2010) (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560–61 (6th Cir. 2000)). That suppression or failure by the prosecution to disclose, which was beyond Abbey's control, was the true cause of the delay in this litigation. Although Abbey does not present an equitable tolling argument, per se, this case speaks to the same underlying principles of fairness, which argue in favor of allowing Abbey to proceed. This Court should not overlook the government's troubling and seemingly deliberate withholding of crucial evidence for three years while Abbey's life fell apart.

In any event, Abbey did not need to rely on equitable tolling principles, because under the discovery rule, the limitations period did not begin until August 2022, and the complaint was timely. As Judge Murphy explains in the lead opinion, the time at which a § 1983 claim accrues depends on whether the occurrence rule or the discovery rule is operable. Under the occurrence rule, the limitations period begins "on the first day that every element of a claim has occurred such that the plaintiff may sue in court over the claim." *Reguli v. Russ*, 109 F.4th 874, 879 (6th Cir. 2024) (per curiam). By contrast, the discovery rule triggers the period only once "the plaintiff [has] discovered, or reasonably should have discovered, basic facts about the claim." *Id.* Although the U.S. Supreme Court has stated that the occurrence rule "presumptively" applies, it has acknowledged in the same breath that "the answer is not always so simple." *McDonough v. Smith*, 588 U.S. 109, 115 (2019) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). In fact, the Court reflected that it had "never suggested that the date on which a constitutional injury first occurs is the only date from which a limitations period may run." *Id.* at 123.

Exercising that flexibility, the Sixth Circuit has maintained the discovery rule with respect to our § 1983 cases. *Reguli*, 109 F.4th at 879; *Bozzo v. Nanasy*, 159 F.4th 1111, 1116

(6th Cir. 2025) ("Despite Supreme Court precedent suggesting otherwise, our Court's cases have applied a 'discovery rule' to § 1983 claims."); *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022) ("[W]e have long held that the discovery rule applies in the § 1983 context."); *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1162 (6th Cir. 2021) (noting "tension" with the Supreme Court's standard occurrence rule but acknowledging that "[o]ur § 1983 caselaw . . . has started the accrual analysis with the competing discovery rule").

Defendants would like to create ambiguity as to which rule applies in this case, where none exists under our case law. *See United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000) (noting that absent an intervening decision by the Supreme Court or the en banc Court of Appeals, the panel must adhere to binding precedent). Even if we may apply the occurrence rule, it would be inappropriate to do so here. Defendants offer no substantive argument in favor of ignoring the application of the discovery rule in the factual circumstances of this case. And ignoring the delayed disclosure of exculpatory evidence—which disclosed to Abbey the basis for her cause of action—would be both unfair to Abbey and contrary to the broad remedial purpose of § 1983, "which is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief." *Burnett v. Grattan*, 468 U.S. 42, 55 (1984).

Under the discovery rule, the limitations period starts when "the plaintiff discovered, or reasonably should have discovered, basic facts about the claim." *Reguli*, 109 F.4th at 879. The question then is, when did Abbey discover, or when should she have reasonably discovered, the basic facts about her Fourth Amendment claims? In order to answer that question, we must identify which facts are the "basic facts." *Id.* That task is sometimes open to interpretation. Generally, "we have looked to what event should have alerted the typical lay person to protect his or her rights." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (quoting *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)). The plaintiff must know enough "to plead factual allegations that impliedly establish[] at least one viable theory." *Dibrell*, 984 F.3d at 1160 (first citing *Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (per curiam); and then citing *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 817 (6th Cir. 2020)). To further complicate matters, the kinds of facts that would alert a plaintiff to

protect her rights and establish a viable legal theory may vary across types of claims. The inquiry "turns on the 'specific constitutional right' at issue[, s]o we start by identifying the elements . . . ." *Reguli*, 109 F.4th at 880 (quoting *Reed v. Goertz*, 598 U.S. 230, 235–36 (2023)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The unreasonableness of a search or seizure is a basic fact and an essential element of a Fourth Amendment claim. *See Segura v. United States*, 468 U.S. 796, 806 (1984) ("By its terms, the Fourth Amendment forbids only 'unreasonable' searches and seizures."); *Howell v. McCormick*, 148 F.4th 834, 844 (6th Cir. 2025) ("The Fourth Amendment's text prohibits only 'unreasonable searches and seizures . . . .'"). A search or seizure is unreasonable under the Fourth Amendment if an officer performs it without the requisite objective level of suspicion, which is typically probable cause. *See Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024) (explaining that the "gravamen" of an unreasonable seizure is lack of probable cause (quoting *Thompson v. Clark*, 596 U.S. 36, 43 (2022))); *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016) (noting that a traffic stop is a Fourth Amendment violation only if the officer lacks the requisite probable cause or reasonable suspicion); *Alman v. Reed*, 703 F.3d 887, 896 (6th Cir. 2013) (noting that an arrest violates the Fourth Amendment if the officer lacks a warrant and probable cause); *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528–29, 535 (1967) (noting that a search violates the Fourth Amendment if executed without a warrant supported by probable cause, except in rare and defined exceptions). Similarly, an officer's use of force is excessive only if it is not "objectively reasonable in light of the facts and circumstances confronting" the officer. *Chrestman*, 156 F.4th at 701 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

Abbey alleges that on August 14, 2019, Stuckey unconstitutionally seized her, searched her vehicle, and used excessive force against her. Therefore, Abbey's statute of limitations began to run when she should reasonably have known that Stuckey took those actions without probable cause or an objectively reasonable justification for the use of force. Until she knew those facts, she did not know of her injury. *See Hopkins v. City of Westland*, 21 F.3d 427 (6th Cir. 1994) (per curiam) (unpublished table decision) ("[S]ince there was probable cause to arrest

plaintiff, he suffered no injury."); *Hall v. Navarre*, 118 F.4th 749, 764 (6th Cir. 2024) (Griffin, J., concurring) ("[W]hen police make a seizure unsupported by probable cause, the injury is the wrongful seizure itself.  Consequently, the presence of probable cause will defeat a Fourth Amendment claim because there is no injury.").

A person subject to an unlawful search or seizure often will immediately have a basis to allege that the officer lacked probable cause.  Perhaps that is why the limitations period in Fourth Amendment search and seizure cases generally begins to run on the date of the search or seizure, as indicated by the cases cited by the lead opinion.  The facts and circumstances of those cases reflect the likelihood that the plaintiffs doubted the reasonableness of the officers' conduct at the outset.  Typically, a lay person would be alerted to protect his rights, for example, if an officer struck him without cause until he lost consciousness or caused him serious physical injury and the need for surgical intervention.  *See, e.g.*, *Wynn v. City of Covington*, No. 24-5840, 2025 WL 2093032, at *1 (6th Cir. July 25, 2025) (noting that officers had allegedly "slammed" plaintiff against police car, hit him until he lost consciousness, placed him in a chokehold, and placed knees and a boot on his back and neck); *Miller v. Cocke Cnty.*, No. 21-5585, 2022 WL 103143, *1–2 (6th Cir. Jan. 11, 2022) (explaining that plaintiff "had reason to know of his injury at the time of his detainment" when "a police officer grabbed him by the neck, body slammed him on the floor, and then picked him up and threw him hard against a wall[,]" causing "eight broken ribs and a punctured lung[,]" and then officers initially refused him medical attention before finally allowing him to be treated in hospital); *Hodge v. City of Elyria*, 126 F. App'x 222, 223 (6th Cir. 2005) (noting that officers had allegedly choked plaintiff, forced him to the ground, and kneed him until he coughed up blood, requiring him to undergo surgery).

In some of those cases, the plaintiffs actively resisted arrest or complained of their injuries immediately, signaling that they considered themselves wronged at the time.  *See Dibrell v. Rex*, No. 25-5334, 2025 WL 3285587, at *1, *3 (6th Cir. Nov. 25, 2025) (noting that plaintiff had resisted arrest and responded to officer's allegation that he was driving with a suspended license and concluding that "*[h]ere,* the event that would have alerted [plaintiff] to his excessive-force claim was the . . . arrest" (emphasis added)); *Wynn*, 2025 WL 2093032, at *1–2 (noting

that plaintiff resisted arrest and "'complained of his injuries' during his detention immediately following the incident" (citation omitted)).

Notably, none of the cases cited in the lead opinion dealt precisely with a plaintiff who argued, or could have plausibly argued, that delayed knowledge about probable cause affected the statute of limitations. *See, e.g.*, *Codrington v. Dolak*, 142 F.4th 884, 891 (6th Cir. 2025) (noting that plaintiff had conceded and forfeited arguments about the timeliness of his search and seizure claims); *Fox v. DeSoto*, 489 F.3d 227, 233–35 (6th Cir. 2007) (stating that excessive force claim accrues at time of arrest "*[a]bsent some . . . delay in accrual[,]*" rejecting argument under *Heck v. Humphrey*, 512 U.S. 477 (1994), that plaintiff's unlawful search and excessive force claims would accrue only after an "anticipated future conviction" was set aside, and alternatively holding that the officer had qualified immunity (emphasis added)), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *Hodge*, 126 F. App'x at 26 (rejecting plaintiff's *Heck* argument); *Wynn*, 2025 WL 2093032, at *3 (addressing argument that plaintiff had been unaware of *extent* of injury and identities of officers at time of arrest). In fact, in *Ruffin v. Kudley*, No. 19-3534, 2020 WL 7062665 (6th Cir. Sept. 1, 2020), the district court had acknowledged that the plaintiff's claims possibly could have accrued months after his arrest, once he became aware of certain procedural issues and the state court dismissed his criminal case. 2020 WL 7062665, *1–2. Although this Court stated that the claims accrued on the date of the arrest, the weight of that holding is diminished because (1) the plaintiff did not establish that he had filed a suit even by the latest hypothetical deadline, and (2) the panel did not confront an argument that the plaintiff ever lacked knowledge that the officers' conduct was unconstitutional. *Id.* at *2–3.

This case is different from those. From the complaint, the inference that Abbey discovered Stuckey's lack of justification when she received the dispatch tapes is plausible—that lack of justification is a basic component of her Fourth Amendment claims. The complaint does not indicate that Stuckey caused Abbey bodily harm akin to the flagrant violence that some of Judge Murphy's cited cases describe. Nor does it state that Abbey contemporaneously complained that Stuckey was violating her rights. Abbey's point is not that she was ignorant of the *extent* of her injury on August 14, 2019, but that she did not know of her constitutional injury

at all. Only when she heard the dispatch tapes did she have the factual basis she would need to plead that Stuckey lacked probable cause to stop her, exercise force against her, search her car, and arrest her. *Cf. Rapp v. Putman*, 644 F. App'x 621, 625 n.1 (6th Cir. 2016) ("[If p]laintiff [had] allege[d] that he did not know or did not have reason to know that he was injured (*i.e.*, that he was being prosecuted . . . without probable cause) . . . , a different accrual date might apply.").

Defendants and the lead opinion frame Abbey's argument as advocating to "delay accrual until a plaintiff has proof of every element of her claim[,]" Defs.' Br. 12, or "learn[s] of both her injuries and their cause," Murphy Op. 7. But those statements misrepresent Abbey's argument. Far from pursuing a "broad expansion of the discovery rule[,]" the analysis that Abbey correctly recommends is a strict application of it. *Id.* at 8. The dispatch tapes were not merely evidence to support a percolating allegation that probable cause was absent, nor were they evidence of the cause of Abbey's injuries; instead, they were the principal factual basis available for alleging the injuries themselves: an *unreasonable* search and seizure and *excessive* force. Unlike other kinds of injuries, which the injured may detect regardless of the perpetrator's point of view, a Fourth Amendment injury exists only if the conduct complained of was unreasonable. In that way, a Fourth Amendment plaintiff such as Abbey differs materially from, say, a medical malpractice plaintiff, who knows that a drug from the hospital harmed him, even if he does not know that the hospital breached a legal duty. *See United States v. Kubrick*, 444 U.S. 111, 122–23 (1979) ("We thus cannot hold that Congress intended that 'accrual' of a claim must await awareness by the plaintiff that his injury was negligently inflicted. A plaintiff . . . armed with the facts about the harm done to him[] can protect himself . . . .").

Concepts that the lead opinion extracts from other areas of law only underscore the exceptionality of Fourth Amendment cases. Reference to the distinction between "actual injury" and "legal wrong" falls flat in the Fourth Amendment context because, at the risk of being repetitive, there is no Fourth Amendment injury without a probable cause problem. Murphy Op. 8–9. This Court has recognized that "in the context of the discovery rule, 'injury' means something more than 'harm[,]'" and that rings true for Abbey. *Snyder-Hill*, 48 F.4th at 702 n.81.

The lead opinion cites *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116 (3d Cir. 1997). In the leadup to that case, the United States had sued New Castle County and others under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675, to require the defendants to clean a hazardous substance site. *New Castle Cnty.*, 111 F.3d at 1119. The Environmental Protection Agency ("EPA") contracted with Halliburton NUS Corp. to investigate and advise on the necessary response actions and then executed consent decrees with New Castle County and the other defendants, requiring them to remediate the pollution of the property. *Id.*

In New Castle's lawsuit against NUS, New Castle claimed that NUS had improperly installed monitoring wells, causing some of the damage NUS later reported. *Id.* The court distinguished between New Castle's "*actual injury,*" i.e., that it would "undertake costly remedial action at the landfill," and "*legal wrong[,]* . . . [i.e.,] that it was agreeing to incur NUS' potential fair share of the clean-up costs . . . ." *Id.* at 1125. New Castle was clearly aware of its injury upon signing a consent decree with the EPA, since New Castle was "aware that other persons were partially responsible for the landfill's condition" and "that NUS' activity and report played a significant role in the determination of New Castle's potential liability." *Id.* The economic injury of having to shoulder the costs of repairing damage for which others were partially responsible was an injury by itself; the statute of limitations began to run when New Castle became aware of the injury and signed a consent decree. *Id.* That New Castle did not know "that it was agreeing to incur NUS' potential fair share of the clean-up costs" did not delay the period. *Id.* That example does not map onto Abbey's Fourth Amendment claims. New Castle was harmed no matter how responsible NUS had been, but Abbey only had a Fourth Amendment injury if Stuckey lacked probable cause. One final demerit to *New Castle*'s utility in Abbey's case is that New Castle's "waive[r of] its discovery rule argument" was "an independent reason . . . not to apply the discovery rule" in that case. *Id.* at 1125 n.10.

*Reguli v. Russ*, 109 F.4th 874 (6th Cir. 2024) (per curiam) does not help my colleagues' argument either. That case pertains to a First Amendment retaliation claim rather than a Fourth Amendment claim. *Reguli*, 109 F.4th at 876. That difference is material in the statute of limitations analysis. *See id.* at 880 ("Whether a plaintiff has a 'complete and present cause of

action' . . . turns on the 'specific constitutional right' at issue." (quoting *Reed*, 598 U.S. at 235–36)).  The elements of Reguli's First Amendment retaliation claim included (1) engagement in protected speech, (2) adverse action, and (3) a causal connection between the speech and the adverse action.  *Id.* (citing cases).  The conclusion that knowledge of the first two elements was enough to put Reguli on notice of her First Amendment injury for statute of limitations purposes, *id.* at 881, 883, does not control in a Fourth Amendment case with completely distinct elements.

Nor do employment law cases control the outcome of Abbey's case.  Public employment discrimination law under § 1983 develops in the shadow of the larger pool of private employment discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34.  *See Lukovsky v. City & Cnty. of S.F.*, 535 F.3d 1044, 1048 n.3 (9th Cir. 2008) ("Although the plaintiffs' actions in this case arise under §§ 1981, 1983, 1985, and 1986, . . . the majority of employment cases involve private employers.  We therefore consider cases arising under other federal laws, such as Title VII or the ADEA, to be instructive.").  Both of those statutes contain express limitations periods anchored to the date of the alleged unlawful practice. *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 520–21 (6th Cir. 2021); 29 U.S.C. §§ 626(d)–(e); 42 U.S.C. §§ 2000e-5(e)–(f).  In fact, the Sixth Circuit case that the lead opinion cites in this regard, *Amini v. Oberlin Coll.*, 259 F.3d 493 (6th Cir. 2001), adjudicated the timeliness of Title VII and ADEA claims—not § 1983 claims.  259 F.3d at 498–99.  The Court focused on the statutory text as a basis for concluding that "the Title VII and ADEA limitations provisions [run] from the date on which the alleged discriminatory act . . . was communicated to the plaintiff." *Id.* at 499.  *Amini* therefore should not guide our statute of limitations analysis under § 1983, which has no self-contained statute of limitations.

Just as easily as Judge Murphy invokes employment cases, we could consider sex discrimination cases that favor Abbey.  Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, provides a remedy "to those who face discrimination on the basis of sex in the American education system." *Snyder-Hill*, 48 F.4th at 699 (quoting *Doe v. Univ. of Ky.*, 971 F.3d 553, 557 (6th Cir. 2020)).  Title IX, like § 1983, contains no statute of limitations. *Id.* at 698.  In *Snyder-Hill v. Ohio State University*, 48 F.4th 686 (6th Cir. 2022), this Court held that

Title IX "plaintiffs' claims accrued when they knew or had reason to know that Ohio State was 'deliberately indifferent to sexual harassment, of which [the school had] actual knowledge . . . .'" *Id.* at 704. The "plaintiff's knowledge [of abuse was] not enough to start the clock." *Id.* at 705. Like Abbey's, the plaintiffs' injuries and claims hinged on facts related to what the defendant knew and how its actions measured against that knowledge. Without knowing those facts, the Title IX plaintiffs could not state their claim.

The argument that a more stringent standard should apply to Fourth Amendment cases because they "do not turn on facts peculiarly in the defendant's control" is wrong. Murphy Op. 9. Probable cause is indeed an objective standard, as is the standard for excessive force. Yet those standards contemplate the stimuli confronting an officer at the time of a given encounter: observations, background, training, and experience that a plaintiff cannot necessarily access. Probable cause turns on "'the facts and circumstances within [] the officers'[] knowledge and . . . reasonably trustworthy information . . . .'" *United States v. Lewis*, 504 F.2d 92, 100 (6th Cir. 1974) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). Reasonable suspicion turns on "the totality of the circumstances," including "all of the information available to law enforcement officials at the time[,]" and the officer's "experience[,] specialized training[,] inferences[,] deductions[,] . . . direct observations, dispatch information, directions from other officers, and the nature of the area and time of day . . . ." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (first quoting *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007); then quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002); and then quoting *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008)). And excessive force turns on "'the facts that were knowable' to the officer at the time[,]" *Chrestman*, 156 F.4th at 701 (quoting *White v. Pauly*, 580 U.S. 73, 77 (2017) (per curiam)), such as "(1) 'the severity of the crime at issue'; (2) 'whether the suspect poses an immediate threat to the safety of the officers or others'; and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight[,]'" *id.* (quoting *Graham*, 490 U.S. at 396). With all of those inputs at her fingertips, a Fourth Amendment plaintiff may be equipped to assess "the *objective* reasonableness of the officer's actions[,]" Murphy Op. 9, but, as Judge Cole concedes, those inputs are not necessarily within reach.

Certainly, Abbey's own subjective experience did not provide her with the knowledge to trigger the limitations period. Both of my colleagues point out that Abbey's complaint described her as driving lawfully on the date of her arrest. But Abbey drafted the complaint with the benefit of hindsight and knowledge of the dispatch tapes. Abbey's knowledge as it existed at the time that she filed the complaint does not belie that she might have accepted the officer's prevarications as true four years earlier.

Abbey's argument in that regard is both plausible and fact-specific. The setting and the nature of the allegations Stuckey levied against Abbey during the stop are significant, and their specificity negates Judge Murphy's concern about a "broad expansion of the discovery rule . . . ." Murphy Op. 8. They affect what events would "alert[] the typical lay person to protect . . . her rights." *Eidson*, 510 F.3d at 635 (quoting *Kuhnle Bros.*, 103 F.3d at 520). When Stuckey pulled Abbey over, he accused her of driving recklessly and evading arrest. Drivers constantly shift their focus and might not notice every flashing light or every pedestrian. Accused by a police officer, any driver might doubt herself and believe that the officer observed conduct that made him genuinely suspicious of a traffic offense. One might be familiar with the experience of receiving an unexpected speeding ticket in the mail, despite having had only lawful intentions on the road. Abbey could reasonably have believed that she had inadvertently inched over the speed limit or failed to notice Stuckey's lights earlier than she did. The same logic might not necessarily apply in a case where a plaintiff was accused of an offense such as drug trafficking, robbery, or homicide, where an accused person might be more certain that she had not committed the offense.

Even if Abbey was certain that she had followed the law, the position that Abbey should have "rel[ied] on her own testimony to pursue th[e] case" is overly simplistic and untenable. Murphy Op. 10. First, it is not clear that courts would have accepted such a factual basis as comporting with the pleading standards. *See Rice v. Jones*, No. 22-3972, 2023 WL 8369996, at *2 (6th Cir. June 23, 2023) (affirming dismissal where plaintiff "did not allege any facts to support an inference that the defendants lacked probable cause to arrest him" and "simply alleged that . . . the troopers 'falsely accused and arrested [him] for trespassing' and other 'conjured up' charges" (second alteration in original)); *Brown v. City of Albion*, 136 F.4th 331,

343 (6th Cir. 2025) ("[W]here the plaintiff's allegations fail to plausibly suggest the absence of probable cause, dismissal is appropriate. . . . No jury issue is presented."); *cf. Bender's, Inc. v. Walker*, 1 F. App'x 317, 325–26 (6th Cir. 2001) (affirming judgment as a matter of law where plaintiff argued defendant "did not have probable cause . . . because he did not and currently does not believe the property was stolen[,]" since "[p]laintiff's claim of innocence, and even actual innocence, does not negate the then-existing probable cause underlying his arrest"). Abbey should not be precluded from bringing her lawsuit based on counterfactual speculation about how courts might have treated these kinds of allegations.

Second, that position runs contrary to Fourth Amendment law. Abbey had to plead the elements of her claims, including that Stuckey lacked probable cause. *Cf. Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (stating plaintiff alleging wrongful arrest must "plausibly allege that it was unsupported by probable cause"). Even had she known that she had done nothing wrong, Abbey could plausibly have accepted Stuckey's observations that the circumstances of the stop provided Stuckey with probable cause. Probable cause is not a matter of certainty or even knowledge of a suspect's guilt. It is the objective presence of sufficient "'facts and circumstances . . . to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Lewis*, 504 F.2d at 100 (quoting *Carroll*, 267 U.S. at 162); *see also Weser v. Goodson*, 965 F.3d 507, 513–14 (6th Cir. 2020) (explaining that probable cause means "a prudent person, or one of reasonable caution" would believe "that the suspect has committed, is committing or is about to commit an offense" (quoting *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003))); *Lyons*, 687 F.3d at 763 (noting that reasonable suspicion requires even less certainty than probable cause); *Chrestman*, 156 F.4th at 701 (noting that "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" dictates the objective reasonableness of force (quoting *Graham*, 490 U.S. at 396)); *Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015) ("[A] court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer."). The subjective experience of the suspect is irrelevant as to whether the officer's conduct violated her rights. If a person cannot avoid a search or seizure based on the fact of her actual innocence, we should not expect her to argue the constitutionality of a search or seizure on that basis alone. *Cf.*

*Baker v. McCollan*, 443 U.S. 137, 145 (1979) (stating that "innocence . . . is largely irrelevant" because "[t]he Constitution does not guarantee that only the guilty will be arrested").

Moreover, our qualified immunity doctrine grants officers the benefit of the doubt on the issue of probable cause. We sometimes excuse Fourth Amendment violations where the "defendants . . . mistakenly but reasonably conclude that probable cause exists." *Lester v. Roberts*, 986 F.3d 599, 607 (6th Cir. 2021); *see also Harville v. City of Warren*, No. 24-1953, 2025 WL 1912769, at *3 (6th Cir. July 11, 2025) (stating that to overcome a qualified immunity defense, a Fourth Amendment plaintiff must show that the defendant "not only lacked probable cause . . . but knew that he lacked it" (citing *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014))); *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986) ("Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." (citation omitted)). For a cause of action to arise, the circumstances must have been such that "an official could be expected to know that certain conduct would violate statutory or constitutional rights . . . ." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982); *see also Kisela v. Hughes*, 584 U.S. 100, 105 (2018) ("An officer 'cannot be said to have violated a clearly established right unless . . . any reasonable official in the defendant's shoes would have understood that he was violating it.'" (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–779 (2014))).

That paradigm presents a Fourth Amendment plaintiff with the uphill battle of showing that, regardless of what she knows to be true, the officer knew he was acting without probable cause. To hold that Abbey's statute of limitations lapsed would be to say that a plaintiff's cause of action accrues before she has knowledge that an officer's behavior resulted from an intention to violate the law, even though an officer is liable based only on that intention. And "[t]o say to one who has been wronged, 'You had a remedy, but before the wrong was ascertainable to you, the law stripped you of your remedy,' makes a mockery of the law." *Snyder-Hill*, 48 F.4th at 699 (quoting *City of Aurora v. Bechtel Corp.*, 599 F.2d 382, 388 (10th Cir. 1979)).

Abbey could have reasoned that perhaps Stuckey had interpreted an innocent but sudden turn while driving as an attempt to evade the police. Perhaps Stuckey could have reasonably

perceived a careful maneuver by Abbey as a near miss of another pedestrian or another driver. Perhaps Stuckey could have confused Abbey with someone else driving a similar vehicle. Whatever explanation Abbey might have reasonably adopted to rationalize Stuckey's actions, a jury should have the opportunity to consider it. *See Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016) (noting that "courts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date" such as "claims that the defendant fraudulently concealed facts, thereby preventing the plaintiff from learning of its injury and complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim" (citations omitted)). Stuckey has not shown that Abbey must have known of her constitutional injury on August 14, 2019, as a matter of law.

Judge Cole agrees that the discovery rule applies to this case but inexplicably believes that Abbey's complaint, which states that Abbey had been following the traffic laws on the date of her arrest, reveals that she had reason to know of her injury on that date.[1] The points made elsewhere in this dissent are worth reiterating. First, the complaint speaks to Abbey's knowledge only as of the time of drafting that document. Even if Abbey knows today that she was driving lawfully on August 14, 2019, Stuckey could have temporarily convinced her that she was not. Second, even if Abbey knew on the date of her arrest that she was obeying the law, that knowledge would not have necessarily informed her that Stuckey lacked probable cause to think otherwise. Then there are the questions of whether the prosecution knew of Stuckey's prevarications and committed misconduct by participating in them by delaying disclosure of the audio tapes—all questions for the jury.

There is an argument to be made that Abbey failed to state a *Brady* claim against Metro because Abbey's *Brady* rights cannot be effectuated unless the case goes to trial. *See United*

---

[1]Judge Cole notes that equitable tolling may have been appropriate in this case. He cites a definition of equitable tolling as "the doctrine that the statute of limitations will not bar a claim if the plaintiff, despite diligent efforts, did not discover the injury until after the limitations period had expired." Cole Op. 15 (quoting *Mezo v. Holder*, 615 F.3d 616, 620 (6th Cir. 2010)). His invocation of that description suggests, contrary to his concurrence, alignment with Abbey's contention that she should be afforded some grace as a result of not discovering her injury until the later date asserted by her.

*States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993) ("This Court has held that due process requires only that disclosure of exculpatory material be made in sufficient time to permit the defendant to make effective use of that material at trial." (citing *United States v. Presser*, 844 F.2d 1275, 1284 (6th Cir. 1988))); *Snow v. Nelson*, 634 F. App'x 151, 156 (6th Cir. 2015) ("Perhaps [plaintiff] would have been released earlier had the [evidence] come to light sooner, but . . . [t]he fifty-two days [he] spent in jail . . . is simply not the type of deprivation *Brady* claims are intended to remedy."). Additionally, it would seem that the district court improperly dismissed D.H.'s claims against Stuckey *sua sponte*. Further, I strongly disagree with the contention that Abbey's claims against Stuckey were time-barred. Accepting as true the well-pled facts as alleged in the complaint, one could reasonably infer that Abbey did not possess the basic facts of her claim until she obtained the dispatch tapes and had a factual basis to doubt Stuckey's assertions of probable case. *Accord Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 199 (3d Cir. 1984) (Higginbotham, J., concurring in part) ("The gravamen of plaintiff's section 1983 claims is deprivation of liberty without probable cause. Thus, her claims accrued when she knew or had reason to know that she was arrested without probable cause.") Abbey is especially entitled to that inference because of the government's disturbing and prolonged concealment of exculpatory evidence. *Cf. Olmstead v. United States*, 277 U.S. 438, 483–84 (1928) (Brandeis, J., dissenting) ("The maxim of unclean hands comes from courts of equity. But the principle prevails also in courts of law. . . . Where the government is the actor, the reasons for applying it are even more persuasive." (footnote omitted)), *overruled by Berger v. State of N.Y.*, 388 U.S. 41 (1967), *and overruled by Katz v. United States*, 389 U.S. 347 (1967).

Because I would reverse the dismissal of Abbey's Fourth Amendment claims against Stuckey, I respectfully dissent.